**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| STATE OF NEW HAMPSHIRE,<br><br>                        Plaintiff,<br><br>v.<br><br>3M COMPANY, E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY f/k/a THE CHEMOURS COMPANY, LLC, CORTEVA, INC., and DUPONT DE NEMOURS, INC.,<br><br>                        Defendants. | Civil Action No.<br><br>NOTICE OF REMOVAL |

Defendant 3M Company ("3M"), by and through undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from New Hampshire Superior Court, Merrimack County, to the United States District Court for the District of New Hampshire. 3M is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). As grounds for removal, 3M states as follows.

**PRELIMINARY STATEMENT**

1.     The State of New Hampshire ("State") brought this action seeking to hold 3M and other Defendants liable based in part on their alleged conduct in designing, manufacturing, and/or selling per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluoro-octanoic acid ("PFOA"), which purportedly have resulted in alleged contamination of the natural resources of the State. In its initial Complaint, each amended complaint, and its December 18, 2021 Initial Rule 22 Disclosure, the State has pleaded that "[t]hrough this action, the State is not seeking damages, remediation, restoration or any other relief

with respect to any contamination related to Aqueous Film-Forming Foam, which is a specialized category of products that contain PFAS compounds, as that is the subject of a separate action." Ex. 1, Second Amended Complaint ("SAC") ¶ 34; *see* Ex. 2, First Amended Complaint ("FAC") ¶ 34 (same); Ex. 3, Initial Complaint ¶ 29 (same); Ex. 4, State's Initial Rule 22 Disclosure at 2 (244 PFAS sites at issue "exclude[] all sites with contamination . . . attributable to AFFF"). Aqueous film-forming foams ("AFFF") are firefighting foams manufactured by 3M and other Defendants that have contained PFAS including PFOS and PFOA, and are the subject of a separate action by the State ("putative AFFF action"). *See* Ex. 5, Putative AFFF Complaint.

2.   However, even though the State in this action purports to disavow any claim for PFAS contamination from AFFF, this action—as the State now has asserted in its March 30, 2022 Response to 3M's Memorandum For Case Structuring Conference—is "not a site-by-site case requiring 244 mini site-specific trials as 3M suggest[ed]" based on the State's prior disclosures, but rather, it is a "state-wide contamination case that will be tried on alternative liability theories." Ex. 6, State Response to 3M at 4. As set forth below, the alleged "state-wide contamination" for which the State apparently intends to seek damages in this action encompasses and overlaps with alleged contamination resulting from the use, storage, and/or disposal of AFFF, including AFFF used at military facilities in New Hampshire, that 3M sold to the U.S. Government in accordance with federal military specifications ("MilSpec AFFF"). To the extent that alleged contamination at issue in this case may in fact arise from MilSpec AFFF, 3M is and will be asserting the federal government contractor defense to the State's claims. Even though the State in its operative Second Amended Complaint purports to disclaim seeking damages in this action "with respect to any contamination related to" AFFF, the State cannot prevent 3M "from raising the production of

MilSpec AFFF as a defense or an alternate theory" of causation. *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021).

3. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M thus is entitled to remove this action to have its federal defense adjudicated in a federal forum, as multiple courts have held in other PFAS cases, including in cases filed by other States. *See Nessel*, 2021 WL 744683 at *4 (upholding removal, denying State of Michigan's motion to remand, and rejecting argument that removal was improper because the complaint disavowed recovery for MilSpec AFFF contamination); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*In re AFFF*"), 2019 WL 2807266, at *2 (D.S.C. May 24, 2019) (denying State of New York's motion to remand). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## BACKGROUND

4. This action is one of two putatively separate actions that the State filed on the same day against 3M and other Defendants in order to recover damages for alleged PFAS contamination of the State's natural resources.

5. On May 29, 2019, the State filed this action in the New Hampshire Superior Court, Hillsborough County North, bearing Index No. 216-2019-CV-00445. Ex. 3, Initial Complaint. Venue for this action was later changed to New Hampshire Superior Court, Merrimack County.

6. According to the Second Amended Complaint, "[t]he State brings this action to address widespread contamination of the natural resources of the State, including lands, waters, and wildlife," from PFAS, including PFOS and PFOA. Ex. 1, SAC ¶ 1. The State generally alleges that Defendants (including 3M) manufactured PFOS, PFOA, and other PFAS chemicals that were

used or discharged in the State of New Hampshire, purportedly resulting in contamination of natural resources. *E.g.*, SAC ¶ 13. The State seeks to hold Defendants liable "for all costs to investigate, clean up, restore, treat, monitor, and otherwise respond to contamination of the State's property and its . . . natural resources." *Id.*, p. 52 (Prayer For Relief). Asserting its "authority to act as *parens patriae*" (*id.* ¶ 33), the State brings claims against 3M and other Defendants for negligence (*id.* ¶¶ 276-83), defective design (*id.* ¶¶ 284-291), and failure to warn (*id.* ¶¶ 292-300).[1]

7.      The State also pleads that "[t]hrough this action," it purportedly "is not seeking damages . . . or any other relief related to [AFFF] . . . as that is the subject of a separate action." *Id.* ¶ 34. That same disclaimer appeared in the State's initial complaint and in each amended complaint. *See* Ex.2, FAC ¶ 34; Ex. 3, Initial Complaint ¶ 29.

8.      In fact, the State has repeatedly disavowed that it seeks any recovery for contamination from AFFF through this action. For instance, in the State's December 17, 2021 Initial Rule 22 Disclosure, the State explained: "Included in these disclosures . . . there may be references to investigations or sites with connections to the use of aqueous film-forming foam ('AFFF'); these documents and references should not be construed as indicating that the State seeks recovery in this case for contamination caused in whole or in part by AFFF, as stated in paragraph 34 of the Second Amended Complaint—the State is not seeking recovery for AFFF-related contamination in this action." Ex. 4, State's Initial Rule 22 Disclosure at 1.

9.      The State filed its putative AFFF action against 3M and other defendants in New Hampshire Superior Court on the same day it filed this action, pleading many of the same allegations as the complaint in this case. *See* Ex. 5, Putative AFFF Complaint.

---

[1]      The State also asserts claims against Defendants other than 3M for actual and constructive fraudulent transfer. Ex. 1, SAC ¶¶ 301-346.

10.     In the putative AFFF action, the State asserted that it brought that action "in order to address contamination of the natural resources of the State, including lands, waters, and wildlife, caused by fluorinated Class B firefighting foam"—*i.e.*, AFFF—"that is manufactured with" PFAS including PFOS and PFOA. *Id.* ¶¶ 1-2. The State generally alleged that the defendants (including 3M) manufactured AFFF that was used in the State of New Hampshire, purportedly resulting in "contaminat[ion of] . . . natural resources" (*e.g.*, *id.* ¶ 12), and the State sought to hold the defendants liable for "all costs" of responding to contamination of natural resources (*id.*, p. 39). The Complaint in the putative AFFF action specifically named military facilities in New Hampshire, including the Pease Air Force Base, as sites of AFFF use that has "impacted" the State's natural resources. *See id.* ¶ 10 (PFAS "have impacted the State's . . . natural resources from the use or storage of AFFF . . . at a number of locations, including . . . the Pease Air Force Base").

11.     Based on the State's allegations of contamination from MilSpec AFFF, 3M removed the putative AFFF action to federal court. *See* Notice of Removal, *State of N.H. v. 3M Co. et al.*, No. 1:19-cv-800, ECF No. 1 (D.N.H. July 31, 2019). The Judicial Panel for Multidistrict Litigation then transferred that action to the *In re AFFF* MDL pending before Judge Richard Gergel in the U.S. District Court for the District of South Carolina. *See In re AFFF Prods. Liab. Litig.*, MDL No. 2873, ECF No. 488 (J.P.M.L. Aug. 12, 2019). The State did not object to either the removal or the transfer of that action.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL UNDER 28 U.S.C. §§ 1441 AND 1446 ARE MET

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 109 and 1441(a) because the New Hampshire Superior Court, Merrimack County, is located within the District of New Hampshire.

13.     3M is not required to notify or obtain the consent of any other Defendant in this action in order to remove this action as a whole under § 1442(a)(1). *See, e.g.*, *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9 (1st Cir. 2009) ("Removal under [§ 1442(a)(1)] does not require that all defendants agree to removal."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006) ("Whereas all defendants must consent to removal under section 1441, a federal officer or agency defendant can unilaterally remove a case under section 1442."); *accord Linden v. Chase Manhattan Corp.*, 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

14.     Pursuant to 28 U.S.C. § 1446(a) and Local Rule 81.1(c), 3M will file with the Clerk's office a certified copy of the state court record within fourteen (14) days of the filing of this Notice of Removal.[2]

15.     This Notice of Removal is timely filed under 28 U.S.C. § 1446(b) because at no time more than 30 days before the filing of the Notice of Removal did the State serve any "paper" on 3M containing "sufficient information to easily determine that the matter is removable." *Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 72 (1st Cir. 2014).

16.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon all parties to this case, and a copy is being filed with the Clerk of New Hampshire Superior Court, Merrimack County. A copy of this Notice of Removal is also being submitted to the Clerk of the New Hampshire Supreme Court, where an appeal has been filed by Defendants other than 3M from a Superior Court order denying their motion to dismiss for lack of personal jurisdiction.

---

[2]     That will include the New Hampshire Superior Court record for Docket No. 216-2019-CV-00445 as well as the New Hampshire Supreme Court record for Case No. 2021-0358.

17.     By filing a Notice of Removal in this matter, 3M does not waive, and reserves, its right to assert any defenses and/or objections to which it may be entitled.

18.     3M reserves the right to amend or supplement this Notice of Removal.

19.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

### REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

20.     Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

21.     Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)."

*Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, "the statute as a whole must be liberally construed" in favor of removal. *Isaacson*, 517 F.3d at 136.

22.     As set forth below, all requirements for removal under § 1442(a)(1) are satisfied here. In many similar cases (including multiple cases filed by the New York Attorney General), courts (including Judge Richard Gergel, presiding over the *In re AFFF* MDL pending in the District of South Carolina) have ruled that removal under § 1442 was proper because the alleged contamination plausibly derived in part from MilSpec AFFF. *See, e.g.*, *In re AFFF*, 2019 WL 2807266, at *2 (denying State of New York motion to remand); Order 3-5, *In re AFFF*, No. 2:18-mn-2873, ECF No. 320 (D.S.C. Sept. 27, 2019) (same); *see also Ayo v. 3M Co.*, 2018 WL 4781145, at *7-15 (E.D.N.Y. Sept. 30, 2018) (denying plaintiffs' motion to remand and finding that federal officer removal based on MilSpec AFFF was proper in case against 3M and other AFFF manufacturers); *Nessel*, 2021 WL 744683, at *3-4 (denying State of Michigan's motion to remand and finding that removal based on MilSpec AFFF was proper in case against AFFF manufacturers).

A.      **MilSpec AFFF**

23.     Since the late 1960s/early 1970s, the United States military began using AFFF that meets military specifications ("MilSpec AFFF") on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the U.S. Naval Research Laboratory developed AFFF (with some assistance from industry participants), and its researchers were granted the first

AFFF patent in 1966.[3]  Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

24.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[5] All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[6] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[7] Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

25.    From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants"—the class of PFAS chemicals

---

[3]    U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[4]    U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), http://bit.ly/2mujJds.

[5]    The 1969 MilSpec and all its revisions and amendments through the April 2020 amendment (MIL-PRF-24385F(4)) are available at https://tinyurl.com/yxwotjpg.

[6]    Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[7]    Dep't of Defense SD-6, at 1.

that includes PFOA and PFOS.[8] And although in 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term."[9] PFOA or PFOS are unavoidably present at some concentrations in some fluorocarbon surfactants used in MilSpec AFFF, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

26.     3M manufactured and sold MilSpec AFFF to the U.S. military for over three decades. In fact, 3M sold MilSpec AFFF directly to at least one facility in New Hampshire, the Pease Air Force Base. One or more AFFF products manufactured by 3M were on the Navy's Qualified Products List for MilSpec AFFF from 1970 until 2010.

**B.     The Alleged Contamination Plausibly Derives In Part From MilSpec AFFF**

27.     The State is seeking damages in this putative non-AFFF case for "state-wide" contamination of natural resources from PFAS. Ex. 6, State Response to 3M at 4. At the same time, the State has acknowledged in its putative AFFF action that PFAS contamination in New Hampshire has resulted in part from the use of AFFF, including at military sites such as the Pease Air Force Base. *See* Ex. 5, Putative AFFF Complaint ¶ 10; *see also* Ex. 7, AFFF Fact Sheet 6 (identifying AFFF sites including some military sites for which the State is seeking to recover in its putative AFFF action, pending in the *In re AFFF* MDL). Although the State from the inception of this case has purported to disclaim "seeking damages, remediation, restoration or any other relief with respect to any [PFAS] contamination related to" AFFF (Ex. 1, SAC ¶ 34; *see also, e.g.*, Ex. 2, FAC ¶ 34; Ex. 3, Initial Compl. ¶ 29; Ex. 4, State's Initial Rule 22 Disclosure at 1), it is

---

8       *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017).

9       *See* MIL-PRF-24385F(3) §§ 3.2, 6.6 (2019).

clear that the alleged PFAS contamination of natural resources in this "state-wide contamination case" will encompass and overlap with claims to recover for PFAS contamination caused at least in part by MilSpec AFFF (Ex. 6, State Response to 3M at 4). Notwithstanding the State's attempt to disclaim AFFF damages—in an apparent effort to avoid federal jurisdiction and transfer to the *In re AFFF* MDL—3M is entitled to a federal forum to "rais[e] the production of MilSpec AFFF as a defense or an alternate theory" of causation. *Nessel*, 2021 WL 744683, at *3.

28.     Although the State has never specifically identified any particular site in New Hampshire where it claims that there is PFAS contamination from both MilSpec AFFF sources (which would give rise to federal officer jurisdiction) and non-AFFF sources (which are ostensibly at issue in this case), such cross-contamination from MilSpec AFFF and non-AFFF sources exists in New Hampshire. In fact, at the March 31, 2022 case structuring conference, counsel for the State described as "fictitious" the list of 244 sites of putative non-AFFF PFAS contamination that the State had previously identified as at issue in this action. Ex. 8, Mar. 31, 2022 Tr. 54:4; *see* Ex. 4, State's Initial Rule 22 Disclosure at 2, 13-19 (identifying 244 sites in New Hampshire where the State "has identified PFAS impacts," "exclud[ing] all sites with contamination known or suspected to be attributable to AFFF, in whole or in part"). The State's counsel told the court  at the conference that "this is not a site-by-site case" but "a statewide case," so "it would be easier if [the State] hadn't" identified those sites because that resulted in "the entire case appear[ing] to be structured around this fictitious site list that doesn't reflect the totality of the State's harm." Ex. 8, Mar. 31, 2022 Tr. 54:11-17, 55:1-6.[10] Counsel for the State also told the court that "even an individual site is not wholly delineated" since the State "doesn't know where the edge of

---

[10]     Counsel for the State clarified that she did not mean that the site list "was not prepared in good faith," and that the "site list is sites identified by New Hampshire's DES [Department of Environmental Services] various program departments." Ex. 8, Mar. 31, 2022 Tr. 54:12-15.

contamination at any one site" may exist (*id*. at 54:24-55:4); and moreover, that "[t]here are contamination claims for harm to public and private water resources" (*id*. at 55:5-6).

29.     Upon information and belief, publicly available evidence shows that the alleged PFAS contamination of natural resources in New Hampshire—including contamination of groundwater and surface waters—from non-AFFF sources overlaps and is commingled with PFAS contamination that derives from MilSpec AFFF use at military facilities.

30.     The Pease Air Force Base, for example, is a site of MilSpec AFFF use located in Portsmouth, New Hampshire for which the State seeks to recover in its putative AFFF action. *See* Ex. 5, Putative AFFF Complaint ¶ 10; Ex. 7, AFFF Fact Sheet 6. MilSpec AFFF released from the Pease Air Force Base plausibly migrates to the Great Bay estuary and other surrounding surface waters where it commingles with PFAS that derives from other, non-AFFF sources. In fact, a site inspection report for Pease Air Force Base, which was prepared for the U.S. Air Force Civil Engineer Center, identifies possible "Drainage to Great Bay" from the Pease Air Force Base via "surface water and sediment exposure pathways." Ex. 9, Pease Final Expanded Site Inspection Report 27 (Mar. 2020); *see also* Ex. 10, Pease Final Expanded Site Inspection Report Figure 1-2 (showing possible drainage pathways from Pease Air Force Base into Great Bay, Little Bay, and Piscataqua River). The site inspection report for Pease Air Force Base also identified PFAS in shellfish tissue sampled at target locations in Great Bay in the vicinity of the Air Force Base. Ex. 11, Pease Final Expanded Site Inspection Report Figure 4-7 (showing PFAS detections in shellfish samples). In addition, an evaluation by the federal Agency of Toxic Substances and Disease Registry ("ATSDR") has linked PFAS releases from AFFF use at Pease Air Force Base to contamination of Great Bay shellfish and deer in the Great Bay National Wildlife Refuge, among other putative contamination of surrounding natural resources. *See* Ex. 12, ATSDR, *Evaluation of*

*per- and polyfluoroalkyl substances (PFAS) detected in private residential water wells located within 1 mile of the Pease International Tradeport* at ii, v-vi, 4-5 (Feb. 24, 2022).

31.     At the same time, putative PFAS contamination of the Great Bay estuary and surrounding natural resources also plausibly derives in part from the non-AFFF sources ostensibly at issue in this action. The State's own disclosures identify a number of putatively "non-AFFF" PFAS sites at issue in this case that are in the vicinity of Pease Air Force base and/or may have contributed to the contamination of the Great Bay estuary because they are adjacent to waterways that flow into the Great Bay. Thus, the State's disclosures identify six sites in Portsmouth, New Hampshire, in the vicinity of Pease Air Force Base, from which "non-AFFF" sources plausibly could have commingled with AFFF releases from Pease Air Force Base. Ex. 4, State's Initial Rule 22 Disclosure at 18. The State's disclosures also identify putatively "non-AFFF" sites at issue here that are adjacent to waterways that flow into the Great Bay—for instance, they identify the Durham Landfill (*id*. at 14), which is adjacent to the Oyster River which flows to the Great Bay.

32.     Moreover, there are thirteen wastewater treatment facilities in New Hampshire that discharge into the Great Bay watershed. *See* Ex. 13, U.S. Environmental Protection Agency, NPDES Great Bay General Permit 3 (Nov. 24, 2020). The effluent from those wastewater treatment plants has been shown to contain PFAS that likely derives in part from non-AFFF sources that would have commingled with AFFF releases to the Great Bay from Pease Air Force Base. *See* Ex. 14, Tavasoli et al., *Distribution and fate of per- and polyfluoroalkyl substances (PFAS) in wastewater treatment facilities*, 23 Envtl. Sci.: Processes & Impacts 903, 903, 905-07, 909-10 (2021) (identifying PFAS concentrations in effluent from six New Hampshire wastewater treatment facilities discharging into the Great Bay watershed and detectable levels of PFAS in multiple surface water samples in the Great Bay and Little Bay estuaries).

33.     Defense Fuels Support Point ("Defense Fuels")—to take another example—is another site of MilSpec AFFF use in New Hampshire for which the State seeks to recover in its putative AFFF action. See Ex. 7, AFFF Fact Sheet 6. MilSpec AFFF released from Defense Fuels plausibly migrates from there to the Piscataqua River where it commingles with PFAS from other, non-AFFF sources. Because Defense Fuels is directly adjacent to the Piscataqua River and groundwater at the site flows in the direction of the Piscataqua River, a site inspection report for Defense Fuels that was prepared for the U.S. Air Force Civil Engineer Center "presumes" that contaminated groundwater at the site discharges into the Piscataqua River. Ex. 15, Site Investigation Report—PFAS—Defense Fuels 71 (Aug. 2020). But Defense Fuels is located upriver from the PSNH Schiller Station PFAS Site—one of the 244 sites identified by the State as at issue in this action. *See* Ex. 4, State's Initial Rule 22 Disclosure 18. Due to the direction of groundwater flow, non-AFFF PFAS from PSNH Schiller Station also likely discharges into the Piscataqua River. *See* Ex. 16, Periodic Summary Report, PSNH Schiller Station 3 (Aug. 25, 2021) ("groundwater elevations indicate groundwater flows east toward the Piscataqua River").

34.     Accordingly, alleged "non-AFFF" PFAS contamination for which the State seeks recovery in this action is plausibly attributable in part to MilSpec AFFF that is commingled with PFAS from other sources—including in estuaries, rivers, and other "public and private water resources" (Ex. 8, Mar. 31, 2022 Tr. 55:5-6)—and 3M thus is entitled to remove this case as a whole pursuant to federal officer jurisdiction. That is because "[i]t is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF," and the State "cannot prevent Defendants from raising the production of MilSpec AFFF as a defense or alternative theory." *Nessel*, 2021 WL 744683, at *3. Especially given that the State acknowledges in its putative AFFF action that PFAS contamination

14

in New Hampshire derives in part from MilSpec AFFF, 3M is entitled to raise "the production of MilSpec AFFF as a defense or alternative theory" to the State's allegations in this case of PFAS contamination of New Hampshire natural resources.

## C. All Four Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied

### 1. The "Person" Requirement Is Satisfied

35. The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) is a "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *see Isaacson*, 517 F.3d at 135-36 (holding that a non-natural entity is a "person" under § 1442(a).").

### 2. The "Acting Under" Requirement Is Satisfied

36. The second requirement, "acting under" a federal officer, is satisfied when an entity "*assist*[*s*], or help[s] *carry out*, the duties or tasks of" a federal officer. *Isaacson*, 517 F.3d at 137. "The words 'acting under' are to be interpreted broadly." *Id.* at 136. Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

37. The requirement is met here because the alleged PFAS contamination of the State's natural resources at issue in this case plausibly stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough

[it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[11]

38.     Accordingly, the military has long depended upon outside contractors like 3M to manufacture and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 ("[I]f a private contractor is performing a job that 'in the absence of a contract with a private firm, the Government itself would have had to perform,' the contractor is acting under a federal officer. . . . This is a product that the Government would have had to create if Defendants[12] did not exist." (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 153-34 (2007))); *Ayo*, 2018 WL 4781145, at *8-9 (holding that 3M and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *In re AFFF*, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military). If 3M and other manufacturers did not provide MilSpec AFFF for use by the military, the government would have to manufacture and provide the product itself. "Therefore, [3M] ha[s] satisfied the 'acting under' requirement of § 1442(a)(1)." *Nessel*, 2021 WL 744683, at *3.

39.     In designing, manufacturing and supplying MilSpec AFFF products, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the MilSpec AFFF products were subject to various tests by the United States Navy before

---

[11]     *Fulfilling the Roosevelts' Vision* 37.

[12]     The "Defendants" in the *Nessel* case include 3M.

16

and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense.[13]

### 3.    The "Under Color Of Federal Office" Requirement Is Satisfied

40.    The third requirement, that a defendant's actions were taken "under color of federal authority," is satisfied when there is a "nexus" between "the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). Like the "acting under" requirement, however, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists." *Id.*[14]

41.    To meet this requirement, "[d]efendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Isaacson*, 517 F.3d at 137-138; *accord, e.g.*, *Moore*, 25 F.4th at 36; *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) ("[T]here need be only *a connection or association* between the act in question and the federal office." (internal quotation marks omitted)). Here, the State's claims for PFAS contamination of natural resources in New Hampshire plausibly arise in part from 3M's production and sale of AFFF manufactured according to military specifications. Plaintiffs are seeking to recover for injuries caused at least in part by the use of PFAS in MilSpec AFFF. 3M contends that the use of PFAS chemicals in MilSpec AFFF was required by military specifications. The State's claims against 3M thus relate to acts taken under color of federal office because those

---

[13]    *See* Dep't of Defense, SD-6, at 1.

[14]    The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

claims plausibly encompass contamination from MilSpec AFFF. *See Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); *In re AFFF*, 2019 WL 2807266, at *2 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims [the defendant] manufactured and sold, and for which the U.S. military imposes MilSpec standards. The Court . . . finds that the causation element of federal officer removal is satisfied here."); *Nessel*, 2021 WL 744683, at *3 ("[I]t is entirely possible that Plaintiffs' injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF."). Because MilSpec AFFF was manufactured by 3M to meet specifications established by the Department of Defense—and military installations are or have been required to employ MilSpec AFFF—the design choices and other liability Plaintiffs are attempting to impose via state law would create a conflict in which 3M could not comply with both the MilSpec and the purported state-prescribed duty of care. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988).

### 4.    The "Colorable Federal Defense" Requirement Is Satisfied

42.    The fourth requirement, a "colorable federal defense," is satisfied by 3M's assertion of the government contractor defense. Courts have repeatedly held that this defense supports removal under § 1442(a)(1). *See Isaacson*, 517 F.3d at 139 (citing other cases).

43.    At the removal stage, a defendant need only show that its government contractor defense is colorable. "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." *Isaacson*, 517 F.3d at 139. At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue. A merely 'colorable' defense is sufficient to 'assure the federal court that it has jurisdiction to adjudicate the case.'" *Cuomo*, 771

18

F.3d at 116 (quoting *Kircher v Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006)).[15] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

44.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

45.     3M has satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. 3M's products appeared on the DOD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the

---

[15]     *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (citations omitted)).

government's reasonably precise specifications."); *In re AFFF*, 2019 WL 2807266, at *2 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

46.     Moreover, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contain PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or health issues.[16] For example, in October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire-fighting exercises are considered to have adverse effects environmentally."[17] More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[18] Indeed, Naval Sea Systems Command continues

---

[16]     *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1-6 (Nov. 4, 2002) (excerpt).

[17]     *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[18]     Dep't of Defense, Aqueous Film Forming Foam Report to Congress 1-2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/y5un3zq8.

to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS

and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF

formulations.[19] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of

PFC-based AFFF products but continues to purchase them supports the position that the

government approved reasonably precise specifications for the claimed defective design."); *In re*

*AFFF*, 2019 WL 2807266, at *2 ("As to whether [Defendant] adequately informed the U.S.

military of dangers associated with its AFFF products of which the military was not already aware,

[Defendant] points to materials such as a November 2017 Department of Defense report to

Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in

drinking water . . . .").

47.     At a minimum, these facts constitute colorable evidence that Naval Sea Systems

Command "made a discretionary determination" regarding the formulation and other

specifications of MilSpec AFFF after weighing the fire-suppression benefits against the alleged

risks. *Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d

Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the

government where 'the government knew as much or more than the defendant contractor about

the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised

"discretionary authority over areas of significant federal interest such as military procurement,"

the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at

89-90; *see also Ayo*, 2018 WL 4781145, at *12.

48.     In short, 3M has met its burden to remove the case—in accordance with other

decisions addressing motions to remand in PFAS litigation—"by alleging that the Government

---

[19]     MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

provided specifications for MilSpec AFFF, that [its] AFFF conformed to those specifications, and that [it was] not aware of any dangers unknown to the Government. Whether these facts are true is not for this Court to determine at this stage. The Court need only consider whether the defense is plausible; it is." *Nessel*, 2021 WL 744683, at *4.

WHEREFORE, 3M hereby removes this action from New Hampshire Superior Court, Merrimack County, to this Court.

Respectfully submitted,

3M Company

By its Attorneys,

MCLANE MIDDLETON, PROFESSIONAL
ASSOCIATION

Dated: April 29, 2022

By:  /s/ Mark C. Rouvalis
Mark C. Rouvalis, NH Bar #6565
Joseph A. Foster, NH Bar #838
Viggo C. Fish, NH Bar #267579
900 Elm Street, P.O. Box 326
Manchester, New Hampshire 03105
Telephone (603) 625-6464
mark.rouvalis@mclane.com
joe.foster@mclane.com
viggo.fish@mclane.com

Michael A. Olsen
Daniel L. Ring
Richard F. Bulger
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Fax: (312) 701-7711
molsen@mayerbrown.com
dring@mayerbrown.com
rbulger@mayerbrown.com

*Counsel for Defendant 3M Company*

## CERTIFICATE OF SERVICE

I certify that on April 29, 2022, I caused true and correct copies of the foregoing Notice of

Removal, with its Exhibits, to be served on counsel for all parties by email, as indicated below.

| STATE OF NEW HAMPSHIRE | |
|---|---|
| K. Allen Brooks<br>Christopher Aslin<br>Department of Justice<br>33 Capitol Street<br>Concord, NH 03301<br>603 271 3650<br>Kelvin.a.brooks@doj.nh.gov<br>Christopher.aslin@doj.nh.gov | Ashley B. Campbell<br>Kenneth Sansone<br>SL Environmental Law Group<br>91 N State Street<br>Concord, NH 03301<br>603 715 9187<br>acampbell@slenvironment.com<br>ksansone@slenvironment.com |
| John D.S. Gilmour<br>William J. Jackson<br>Lana M. Rowenko<br>David Zalman<br>Kelly Drye & Warren LLP<br>515 Post Oak Blvd, Suite 900<br>Houston, TX 77027<br>(713) 355-5005<br>lrowenko@kelleydrye.com<br>jgilmour@kelleydrye.com<br>bjackson@kelleydrye.com<br>dzalman@kellydrye.com | Robert A. Bilott<br>David J. Butler<br>Taft Stettinius & Hollister LLP<br>425 Walnut Street #1800<br>Cincinnati, OH 45202-2838<br>614 334 6167<br>bilott@taftlaw.com<br>dbutler@taftlaw.com |
| Tate Kunkle<br>Rebecca G. Newman<br>Michael A. London<br>Gary J. Douglas<br>Douglas & London<br>59 Maiden Lane, 6th Floor<br>New York, NY 10038<br>212 566 7500<br>tkunkle@douglasandlondon.com<br>rnewman@douglassandlondon.com<br>mlondon@douglasandlondon.com<br>gdouglas@douglasandlondon.com | Kevin J. Madonna<br>Kennedy & Madonna, LLP<br>48 Dewitt Mills Road<br>Hurley, NY 12443<br>845 481 2622<br>kmadonna@kennedymadonna.com |

| CHEMOURS COMPANY | |
|---|---|
| David Himelfarb<br>Lanny Kurzweil<br>McCarter & English<br>265 Franklin Street, 14th Floor<br>Boston, MA 02110<br>617-449-6555<br>dhimelfarb@mccarter.com<br>lkurzweil@mccarter.com | Martha Donovan<br>Margaret Raymond-Flood<br>Norris McLaughlin, PA<br>400 Crossing Blvd, #8 Floor<br>P O Box 5933<br>Bridgewater, NJ 08807<br>908-252-4240<br>mndonovan@norris-law.com<br>mrflood@norris-law.com |
| Lisa Snow Wade<br>Orr & Reno, PA<br>45 S Main Street<br>Concord, NH 03301<br>603-223-9150<br>wade@orr-reno.com | Ira M. Gottlieb<br>McCarter & English<br>265 Franklin Street, 14th Floor<br>Boston, MA 02110<br>617-449-6555<br>igottlieb@mccarter.com<br>cbetz@mccarter.com |
| E.I. DUPONT DE NEMOURS COMPANY | |
| David Himelfarb<br>Ira M. Gottlieb<br>Cynthia C. Betz<br>McCarter & English<br>265 Franklin Street, 14th Floor<br>Boston, MA 02110<br>617-449-6555<br>dhimelfarb@mccarter.com<br>igottlieb@mccarter.com<br>cbetz@mccarter.com | |

| | |
|---|---|
| Adam L. Hoeflich<br>Katherine L.I. Hacker<br>Tulsi E. Gaonkar<br>Katharine A. Roin<br>Bartlit Beck LLP<br>Courthouse Place<br>54 West Hubbard Street, Suite 300<br>Chicago, IL 60654<br>312 494 4400<br>adam.hoeflich@bartlit-beck.com<br>kat.hacker@bartlit-beck.com<br>tulsi.goankar@bartlit-beck.com<br>kate.roin@bartlitbeck.com | Russell Hilliard<br>Brooke Lovett Shilo<br>Upton & Hatfield<br>159 Middle Street<br>Portsmouth, NH 03801<br>603 436-7046<br>rhilliard@uptonhatfield.com<br>bshilo@uptonhatfield.com |

**CORTEVA, INC.**

| | |
|---|---|
| Russell Hilliard<br>Brooke Lovett Shilo<br>Upton & Hatfield<br>159 Middle Street<br>Portsmouth, NH 03801<br>603 436-7046<br>rhilliard@uptonhatfield.com<br>bshilo@uptonhatfield.com | Katherine L.I. Hacker (pro hac vice)<br>Adam L. Hoeflich (pro hac vice)<br>Katharine A. Roin (pro hac vice)<br>Amy R. Gore (pro hac vice)<br>Bartlit Beck LLP<br>Courthouse Place<br>54 West Hubbard Street, Suite 300<br>Chicago, IL 60654<br>312 494 4400<br>kat.hacker@bartlitbeck.com<br>adam.hoeflich@bartlitbeck.com<br>amy.gore@bartlitbeck.com |

**DuPONT de NEMOURS, INC..**

| | |
|---|---|
| Russell F. Hilliard<br>Brooke Lovett Shilo<br>Upton & Hatfield<br>159 Middle Street<br>Portsmouth, NH 03801<br>603 436-7046<br>rhilliard@uptonhatfield.com<br>bshilo@uptonhatfield.com | Katherine L.I. Hacker (pro hac vice)<br>Adam L. Hoeflich (pro hac vice)<br>Katharine A. Roin (pro hac vice)<br>Amy R. Gore (pro hac vice)<br>Bartlit Beck LLP<br>Courthouse Place<br>54 West Hubbard Street, Suite 300<br>Chicago, IL 60654<br>312 494 4400<br>kat.hacker@bartlitbeck.com<br>adam.hoeflich@bartlitbeck.com<br>amy.gore@bartlitbeck.com |